IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LESLEE A. NELSON, et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>RAYAH LEVY, et al.,<br><br>    Defendants. | Case No. 16-cv-03797-MMC<br><br>**ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>Re: Dkt. No. 48 |

Before the Court is plaintiffs' Motion for Preliminary Injunction, filed November 23, 2016. The matter came on regularly for hearing on March 17, 2017. D. Gill Sperlein of the Law Office of D. Gill Sperlein and Abraham M. George of the Law Office of Abraham George, P.C. appeared on behalf of plaintiffs Leslee A. Nelson ("Nelson") and Nancy Barth ("Barth"). Mark A. Pruner of the Law Office of Mark A. Pruner appeared on behalf of defendants Rayah Levy ("Levy") and Rachel Rayah Levy International, Inc. ("RRLI") (collectively, "Levy Defendants"). Andrew D. Winghart of Winghart Law Group appeared on behalf of defendant Jessica Jacobson ("Jacobson").

At the hearing, the Court afforded the Levy Defendants the opportunity to file a surreply to address issues raised by plaintiffs for the first time in their reply, and, on April 4, 2017, the Levy Defendants submitted additional declarations as to those issues.

The Court, having considered the papers filed by the parties, as well as the arguments of counsel at the hearing, rules as follows.

**BACKGROUND**

In the operative complaint, plaintiffs' Second Amended Complaint ("SAC"),

plaintiffs allege the following:

Levy is a "co-founder" and the "Chief Executive Officer" of RRLI, (SAC ¶ 15), which "does business as ArtéQuesta" (id. ¶ 19). Jacobson is "an art collector who teamed up with [Levy] in 2008 to co-found ArtéQuesta" (id. ¶ 17) and "was the Chief Creative Officer of ArtéQuesta until at least the end of 2013" (id. ¶ 21). "Defendants hold themselves out to the public . . . as a museum, investment advisors, and well-connected art experts, who are able to assist individuals, families, companies, and institutions build investment quality art collections." (Id. ¶ 31.)

Barth "first met [Levy] in August of 2013" (id. ¶ 47), at which time Levy "described herself to Barth as [an] investment advisor and an art expert in Jewish art" (id. ¶ 49) and "told Barth that most of ArtéQuesta's clients had no prior experience in art investments, but that they nonetheless had made substantial profits in art investments made through [] ArtéQuesta" (id. ¶ 50). Based on these and other representations, Barth "agreed to purchase" art from ArtéQuesta and wired "$370,000" to the bank account specified by Levy. (See id. ¶¶ 52-53.) "Shortly thereafter, Barth received through the mail 'Certificates of Fine Art Evaluation'" that "indicated the artwork she had purchased had more than tripled in value." (Id. ¶ 54). "In Autumn 2013, after further solicitations," Barth, "[b]ased on the additional assurances and the incredible success of her initial investment, . . . purchased two additional artworks . . . for a total of $50,000." (Id. ¶ 56.)

Nelson "first met [Levy] in September 2014" (id. ¶ 59) and Levy represented herself to Nelson "as an art investment advisor," telling Nelson that "investing in art – specifically the art that [Levy] and ArtéQuesta had identified and selected for clients, would be a safer and more profitable investment than a portfolio of stocks and bonds" (id. ¶ 61) and ArtéQuesta's art "was a remarkable, enduring investment that could only go up in value as she had made so much money for so many of her clients" (id. ¶ 62). Based on these and other representations, "Nelson decided to make an initial investment of $300,000" and wired that sum to an RRLI account on November 20, 2014 (see id. ¶¶ 68-69), after which she also "received certificates of fine art authenticity claiming that

the artwork had more than doubled in value" (id. ¶ 73). Plaintiffs later discovered that "five of the six pieces [Nelson] purchased belonged to . . . Barth." (See id. ¶ 71.) Such sale, however, was "not made on behalf of Barth," who was "never informed . . . of the sale." (Id. ¶ 72.)

Plaintiffs allege that Levy's representations to plaintiffs as to the value of the art was "knowingly and materially false," that the art was only "worth approximately 10% to 20% of what [p]laintiffs paid for it" (id. ¶ 162), and that "Levy and/or Jacobson made the [certificate] values up from thin air" (id. ¶ 55). In support thereof, they allege that Nelson, who at some point "insisted that ArtéQuesta deliver the artwork to her," hired two appraisers, one of whom "valued the collection for which Nelson had paid $300,000 at a mere $30,000" and the other "appraised it at even less: $17,000." (See id. ¶ 74.) Nelson later "sold the collection through an estate liquidation company for a mere $11,781," and Barth "never received any money or artwork." (See id.)

Based thereon, plaintiffs assert four Causes of Action, titled, respectively: "Violation of RICO – § 1962(c) (Against All Defendants)," "Conspiracy to violate RICO – 18 U.S.C. § 1962(d) (Against all Defendants)," "Fraud: Intentional Misrepresentation (Against All Defendants)," and "Breach of Oral Contract (Against Defendants Rayah Levy, and RRLI, Inc.)"[1] In addition to damages, plaintiffs seek "injunctive relief in the form of a constructive trust" as to "[p]laintiffs' funds used to purchase artwork, as well as any artwork or other assets purchased with those funds." (Id. at 44:16-20.)

By the instant motion, plaintiffs seek a preliminary injunction "to freeze [d]efendants' assets in order to ensure that the illicit profits remain available so that the Court will have the ability to order the equitable relief of a constructive trust." (Mot. at 2:11-13.) In particular, plaintiffs ask the Court to enjoin defendants from (1) "selling, moving, transferring, or dissipating any artwork currently in their possession or control"; (2) "selling moving, transferring, or dissipating illicit profits earned from the art investment

---

[1] On February 21, 2017, Barth withdrew her claim for breach of oral contract.

3

1 funds obtained from [plaintiffs] or any funds or assets purchased with said illicit profits"; and (3) "selling, transferring, or encumbering any real property in which any [d]efendant holds an interest." (Pl.'s Proposed Order, at 2:20-3:2.)

**LEGAL STANDARD**

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." See Winter v. Nat. Res. Def. Council, 555 U.S. 7, 22 (2008). "A plaintiff seeking a preliminary injunction must establish that" (1) "he is likely to succeed on the merits," (2) "he is likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in his favor," and (4) "an injunction is in the public interest." Id. at 20.

In the alternative, a plaintiff may establish, rather than a likelihood of success on the merits, "that serious questions going to the merits were raised," provided such plaintiff also establishes a likelihood of irreparable harm, "a balance of hardships that tips sharply toward the plaintiff," and the injunction is in the public interest. See All. for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1135 (9th Cir. 2011). A "serious question" is "one as to which the moving party has a fair chance of success on the merits." Sierra On-Line, Inc. v. Phoenix Software, Inc., 739 F.2d 1415, 1421 (9th Cir. 1984).

**DISCUSSION**

In support of their respective positions as to an injunction, the parties have submitted a number of declarations, both from themselves and from other individuals. At the outset, the Court addresses whether, in addition to those declarations, an evidentiary hearing is necessary. In that regard, the Court first notes that, for purposes of determining a motion for preliminary injunction, the Court "is not required to make . . . binding findings of fact," rather, "it need only find probabilities that the necessary facts can be proved." See id. at 1423.

Here, plaintiffs and Jacobson, in their briefing, have asked the Court to hold an evidentiary hearing to assess the credibility of the declarants. As the Court noted at the March 17 hearing, however, "plaintiffs' entire case . . . is based on an argument that the

4

art pieces they bought were so over-valued that the differential is reflective of a state of mind consistent with an intent to deceive them." (Hearing Tr., Mar. 17, 2017, at 6:2-6.) Having reviewed the appraisers' competing declarations and other submissions bearing on their respective valuations, some of which, with leave of court, were filed after the hearing, the Court finds it now has before it a sufficient record for purposes of determining the effect of that evidentiary dispute on the probability of plaintiffs' prevailing on their claims. As to additional individuals likely to be called at trial, the Court, as discussed below, has a sufficient evidentiary basis upon which to assess their potential as persuasive witnesses. See, e.g., Hilo v. Exxon Corp., 997 F.2d 641, 646 (9th Cir. 1993) (holding request for preliminary injunction "should not be made the occasion for a mini-trial" on ultimate issue).

Accordingly, the Court finds an evidentiary hearing is not needed in this instance, and next considers whether plaintiffs have met their burden of showing a preliminary injunction is warranted.

**A. Likelihood of Success or Serious Questions**

As set forth above, plaintiffs must show either that they are likely to succeed on the merits or that they have raised a serious question going to the merits. As the evidence on which plaintiffs' claims against Jacobson and the Levy Defendants are based differs considerably, the Court addresses each, in turn.

**1. Jacobson**

The parties agree that Jacobson did not interact with either plaintiff. Plaintiffs contend Jacobson was a co-conspirator in the alleged fraudulent scheme and, in support thereof, offer the following circumstantial evidence: Jacobson and Levy "were publicly identified" as the co-founders of ArtéQuesta (see Yamot Decl., filed Nov. 23, 2016, ¶ 39);[2] Barth met with Levy at Jacobson's residence (see Barth Decl. ¶ 5), and Jacobson

---

[2] According to the First Amended Complaint ("FAC"), Jacobson "may have left the enterprise at the end of 2013." (See FAC at 9 n.5.)

was paid by ArtéQuesta for such general use, as well as for storage of art (see Yamot Decl., filed Nov. 23, 2016, ¶ 42); Jacobson shared a bank account with Levy (see id. ¶ 10); Jacobson showed Yamot how to create "fake certificate[s] of fine art evaluation[]" (see id. ¶ 25); and Jacobson, in speaking with Yamot, "acknowledged" the "greatly inflated values" (see id. ¶ 31). Earlier, in ruling on Jacobson's motion to dismiss the SAC, the Court reviewed essentially the same allegations, and, after piecing them together to construct a timeline, found plaintiffs had alleged barely enough facts to survive the motion. (See Hearing Tr., Feb. 17, 2017, at 53:16-62:22; 79:2-5; Order, filed Feb. 24, 2017.)

Moreover, plaintiffs' evidence as to Jacobson, which has been challenged by both Jacobson and Levy, is based almost entirely on declarations provided by a former ArtéQuesta employee, Maritony Yamot ("Yamot"), whose credibility is subject to dispute. In particular, in addition to disputing Jacobson's' position in the company and her involvement in any sale to either plaintiff, defendants have submitted evidence that, prior to the filing of the instant action, RRLI had sued Yamot in state court for, inter alia, fraud in the course of her employment as RRLI's Chief Financial Officer (see Def. Jacobson's Request for Judicial Notice, Ex. 1) and had obtained a default judgment against her in the amount of $491,238 (see id. Ex. 2).[3] Although the Court makes no finding itself as to Yamot's credibility or the truth of the allegations in the state court action, the Court finds the litigation between Yamot and RRLI substantially weakens Yamot's value as a witness and, in turn, plaintiffs' already thin circumstantial evidence as to Jacobson.

Under such circumstances, the Court finds plaintiffs have failed to make the requisite showing as to the first element of either of the above-described tests for preliminary injunctive relief and, consequently, as to Jacobson, plaintiffs are not entitled

---

[3] Plaintiffs' request for judicial notice as to the complaint and default judgment in the state court action is hereby GRANTED. See Rosales–Martinez v. Palmer, 753 F.3d 890, 894 (9th Cir. 2014) ("It is well established that [a court] may take judicial notice of judicial proceedings in other courts.")

to such relief.

### 2. Levy Defendants

Turning next to the Levy Defendants, the Court first notes there is no dispute that Levy sold plaintiffs authentic artwork, i.e., the pieces plaintiffs purchased were in fact created by the artists to whom they were attributed by Levy. The dispute here centers around whether the values Levy attributed to those pieces were so inflated in comparison to their actual value as to constitute fraud.[4] As noted, as to that issue, plaintiffs and the Levy Defendants have submitted reports by their respective appraisers, as well as other evidence relevant to the value of the art in question.

Specifically, plaintiffs have submitted two reports from Tony Pernicone ("Pernicone"), an experienced and accredited appraiser (see Pernicone Decl., filed Nov. 23, 2016, Ex. A), in which Pernicone evaluated the six pieces for which Nelson paid $300,000 (see Nelson Decl. ¶ 26); in one report, he concludes the fair market value of the collection was, as of August 2015, $26,500 (see Pernicone Decl., filed Feb. 3, 2017, Ex. A at 4) and, in the other, he concludes the comparable insurance replacement value was $41,500 at that time (see id. Ex. B at 4). The Court, for purposes of the instant dispute, finds the fair market value is the more relevant figure. (See id. Ex. A at 5 (identifying "fair market value" as "[t]he price that the property would sell for on the open market"); id. Ex. B at 5 (identifying "comparable insurance replacement value" as "the price in terms of cash or other precisely revealed terms that would be required to replace one property with another of similar age, quality, origin, appearance and condition").)

As to fair market value, the Levy Defendants have submitted a report from Frances Zeman, also an experienced and accredited appraiser (see Zeman Decl. Ex. A), who identifies various inconsistencies in Pernicone's report and further opines that

---

[4] Although Barth states she has not received the proceeds from the sale of the art she purchased, and although the Levy Defendants do not dispute Barth's entitlement to those proceeds, the Court finds any failure to pay such sum (a failure the Levy Defendants attribute to Yamot's misappropriation of their assets) bears primarily on Barth's claim for breach of oral contract, which, as noted above, has been withdrawn.

Pernicone failed to adhere to industry standards as to the assessment of fair market value. (See id. Ex. B.) In addition, the Levy Defendants have submitted a report from Jane St. Lifer, another experienced and accredited appraiser (see St. Lifer Decl. Ex. A), in whose opinion one of the pieces at issue, an original oil with ground basalt by Moshe Castel, titled Tabernacle of Israel,[5] had, at the time of Nelson's purchase in November 2014, and, contrary to the $10,000 value placed on it by Pernicone (see Pernicone Decl., filed Feb. 3, 207, Ex. A at 18),[6] a fair market value of $39,000 (see St. Lifer Decl. Ex. B at 12), i.e., $14,000 more than the $25,000 Barth paid for the piece in August 2013 (see Barth Decl. ¶ 12, Ex. A at 4), and $3400 more than the $35,600 Nelson paid (see Nelson Decl. ¶ 26).

Further, in their supplemental filings, the Levy Defendants have submitted additional information as to the sources Levy consulted in establishing the values she assigned to plaintiffs' purchases. In particular, the Levy Defendants have submitted details from sales conducted by auction houses, showing, for three Castel pieces, sales in amounts over $100,000 and, for a fourth Castel piece, a sale in the amount of $216,000. (See Levy Decl., filed Apr. 7, 2017, Ex. A at 1-4.) As to Yaacov Agam, another artist whose work was purchased by plaintiffs, the Levy Defendants have submitted similar details as to various pieces, one of which was sold by Sotheby's for $698,500, and others of which were sold for substantial sums ranging from $20,000 to $326,500. (See id. Ex. A at 7-16.) Although the Court makes no finding as to whether such pieces are comparable to the pieces purchased by plaintiffs, the evidence of their sales is relevant to show the artists in question are capable of commanding, on the open market, high prices for their work.[7]

---

[5] At the hearing, the parties agreed that the appraisers need not value all of the art purchased by both plaintiffs, and instead could value certain pieces as examples that the Court would consider indicative of the difference in value as seen from the standpoint of the respective parties.

[6] As noted above, Pernicone valued the piece as of August 2015.

[7] Additionally, Levy's fiancé Randall Derrick ("Derrick"), also an art dealer (see

1    Given the above evidence, the Court, as to the Levy Defendants, finds plaintiffs have not shown a likelihood of success on their fraud claims, but have raised a serious question going to the merits of those claims. The Court thus turns to the question of irreparable harm.

**B. Likelihood of Irreparable Harm**

As noted above, plaintiffs seek to freeze defendants' assets "so that the Court will have the ability to order the equitable relief of a constructive trust." (Mot. at 2:11-13.) A "preliminary injunction barring asset transfer is available where the suit seeks equitable relief." Johnson v. Courturier, 572 F.3d 1067, 1084 (9th Cir. 2009). To obtain such an injunction, plaintiffs "must show a likelihood of dissipation of the claimed assets, or other inability to recover monetary damages if relief is not granted." Id. at 1085. Evidence of a defendant's "own prior conduct" can establish "a likelihood that in the absence of an asset freeze and accounting, [p]laintiffs will not be able to recover the improperly diverted funds and thus will be irreparably harmed." Id.

As evidence of such a likelihood, plaintiffs submit the following: (1) the resale of part of Barth's art to Nelson, which, plaintiffs argue, shows the Levy Defendants "are willing to resell those works" and "[t]he only way to insure the preservation of the artwork" is an injunction (Mot. at 22:24-26); and (2) declarations by Yamot and plaintiffs' counsel Abraham George ("George"), which, plaintiffs argue, shows the Levy Defendants "regularly immediately move cash out of ArtéQuesta checking accounts and into either accounts held by friends or relatives or to accounts outside this Court's jurisdiction" (id. at 23:7-9).

---

Derrick Decl. ¶ 1), has submitted a declaration in which he states he purchased the six pieces Nelson sold at the estate sale (see id. ¶¶ 3-4; Nelson Decl. ¶¶ 26, 43-44), and resold Tabernacle of Israel for $35,000 "to a client in Hillsborough, . . . [who] took several months to decide on his purchase." (Derrick Decl. ¶ 8). Derrick further states that, after paying $16,830 for all six pieces, he sold four of those pieces for prices ranging from $35,000 to $36,500 (see Derrick Decl. ¶ 6-8) and two for $90,000 each (see id. ¶ 9). Given his relationship to one of the defendants, however, Derrick's credibility can be challenged on grounds of bias, and, in the absence of corroboration by arms-length purchasers, will carry significantly less weight than the evidence of auction house sales.

As to the resale of plaintiffs' art, the Court notes that the Levy Defendants have returned all of Nelson's art, which, as set forth above, she has sold, and that, at the March 17 hearing, the Court ordered the Levy Defendants, and they agreed, to hold any of Barth's art that remained in their possession.

As to the Levy Defendants' bank accounts, to the extent plaintiffs rely on Yamot's declaration, in which she states Levy made trips overseas "with large amounts" of cash, wired "large sums" of money overseas, and "boasted" that she was "'judgment proof'" (see Yamot Decl., filed Nov. 23, 2016, ¶¶ 32-33), such witness's credibility is, as set forth above, subject to question. As noted, plaintiffs also rely on a declaration from their counsel, who states he reviewed the Levy Defendants' bank statements in connection with collecting a judgment brought by a former ArtéQuesta employee, Marissa Halbrecht ("Halbrecht"), and that those bank accounts "would start out with at least hundreds of thousands of dollars in 2013," that by 2015, "most of the accounts hovered in tens of thousands of dollars," and that "almost all the money that came in went right out." (George Decl. ¶ 9.) No detail, however, let alone documentation, has been provided in support thereof, nor have plaintiffs shown any such asserted movement of funds is inconsistent with legitimate personal or business purposes, particularly given Levy's undisputed family and business ties to Israel. Moreover, to the extent plaintiffs rely on any difficulty George may have faced in collecting the above-referenced judgment, George acknowledged at the March 17 hearing that Halbrecht, although it "took a year," did collect the amount awarded. (Hearing Tr., Mar. 17, 2017, at 49:19-50:4.)

Given the above, the Court finds plaintiffs have not shown a likelihood of dissipation of assets by the Levy Defendants or that plaintiffs otherwise will be unable to recover damages if awarded in the instant action.

Under such circumstances, as to the Levy Defendants, plaintiffs, having failed to establish the second of the above-listed elements, have not shown they are entitled to a

preliminary injunction.[8]

## CONCLUSION

For the reasons stated above, plaintiffs' motion for a preliminary injunction is hereby DENIED.

**IT IS SO ORDERED.**

Dated: May 23, 2017

*Maxine M. Chesney*
MAXINE M. CHESNEY
United States District Judge

---

[8] In light of this finding, the Court does not address herein either of the two remaining elements. The Courts does note, however, that where, as here, the requested injunction "has no impact on non-parties, the public interest will be at most a neutral factor." See Stormans, Inc. v. Selecky, 586 F.3d 1109, 1138-39 (9th Cir. 2009).

11